## Commonwealth v. Sherman

*Edward J. Zamborsky*, for petitioner.
*Gerald I. Roth*, for respondents.

DAVISON, *J.*, February 14, 1977—In this child custody proceeding, Edward J. Zamborsky, Jr., Esq. (Zamborsky), attorney for petitioner, Barbara Behr Sherman (mother), sought to depose two of the respondents, William Dilcher and Yvonne Dilcher (paternal grandparents), on October 26, 1976, in order to determine the whereabouts of the subject child (Susan) and the third respondent, James Victor Sherman (father), the father of the 11-year-old Susan. The paternal grandparents were represented by Gerald I. Roth, Esq. (Roth) at the depositions. When questioned about whether or not they had spoken with or were otherwise acquainted with the whereabouts of their son and granddaughter, the Dilchers, on the advice of Roth, refused to answer, asserting the privilege against self-incrimination.

At a December 8, 1976, hearing scheduled before this court for the purpose of determining whether the Dilchers are entitled to assert the Fifth Amendment, both Zamborsky and Roth agreed that the matter was a question of law and submitted the issue to the court on briefs. The brief of the petitioner was thereafter timely filed by Zamborsky on December 10, 1976. The brief of the Dilchers, due December 28, 1976, never has been filed. Inasmuch as this case involves the custody of a young child, a matter of the utmost importance, and notwithstanding Roth's failure to submit a brief to the court, we proceed to a disposition.

Chronologically, this litigation arose on January 8, 1974, when the mother petitioned for a writ of habeas corpus upon which my colleague, The Honorable Donald E. Wieand, decreed that a writ issue returnable January 22, 1974, and directed that all three respondents and Susan appear before the court that day. According to the sheriff's return, copies of the order and writ were served upon all three respondents on January 8, 1974, at 1423 Exeter Road, Allentown, Lehigh County, Pa., then and presently the residence of the Dilchers. The father neither appeared nor produced Susan for the January 22, 1974, hearing. Following that hearing, and after hearing the testimony presented, this court entered an order awarding custody of the child to her mother.

The child's mother has neither seen nor heard from the child or respondent Sherman since before the date of that hearing, three years ago.

At the depositions of October 26, 1976, Zamborsky inquired of Susan's grandmother:

"Q. . . . Since January 22, of 1974 have you spoken with your son, James Sherman?

594

Mr. Roth: At this point from here on in, Yvonne, I would advise you to refuse to testify on your constitutional rights granted by the Fifth Amendment of the United States Constitution. You have to answer.

A. I refuse to testify under the grounds that I could be involved criminally according to my rights under the Constitution, the Fifth Amendment.

Q. Since January 22nd of 1974 have you spoken with your granddaughter, Susan Yvonne Sherman?

Mr. Roth: Same thing.

A. I refuse to testify under the Fifth Amendment.

Q. Have you received any correspondence from either your son, James Sherman, or your granddaughter, Susan Yvonne Sherman, since January 22nd, 1974?

A. I refuse to testify under the rights of the Fifth Amendment.

Q. Have you received correspondence since January 22nd, 1974, from Barbara Sherman addressed to James Victor Sherman or Susan Yvonne Sherman?

A. I refuse to testify under the Fifth Amendment.

Q. Do you know the present whereabouts of James Victor Sherman?

A. I refuse to testify under the Fifth Amendment.

Mr. Roth: She's invoking the Fifth Amendment each time.

Q. Do you know the present whereabouts of Susan Yvonne Sherman?

A. I refuse to answer on the grounds it may tend to incriminate me.

Q. Have you discussed the whereabouts, location, mental health of James Victor Sherman with your counsel, Gerald Roth?

Mr. Roth: Excuse me. Now, on this one I will advise her that you don't have to testify because of a privilege that exists between a client and an attorney. All right. It's a different privilege.

Can you put that on the record that she's invoking the attorney-client privilege.

. . .

Q. Have you received requests from Barbara Sherman, your former daughter-in-law, as to the whereabouts of her daughter, Susan Sherman, and her former husband James Sherman?

A. I refuse to testify.

Mr. Roth: You have to speak loudly so that Mr. Carr can hear. You refuse to testify on the grounds of the Fifth Amendment?

The Witness: Right."

Zamborsky likewise made inquiry of Susan's grandfather:

"Q. Were you present at the time this notary was taken on the Power of Attorney executed to your wife? (A Power of Attorney was executed by James Victor Sherman to Mrs. Dilcher.)

Mr. Roth: I would advise you to invoke your rights.

A. I invoke my Fifth Amendment rights.

Q. Since January 22nd of 1974, Mr. Dilcher, have you been in contact with Susan Yvonne Sherman?

A. Under advice of counsel I invoke my rights under the Fifth Amendment.

Q. Since January 22 of 1974 to the present time have you been in contact with James Victor Sherman?

A. Under advice of counsel I refuse to testify under the Fifth Amendment.

Q. Do you know the present whereabouts of James Victor Sherman or Susan Yvonne Sherman?

A. I refuse to testify under my constitutional rights.

Q. Have you visited with or has your wife visited with Susan Yvonne Sherman or James Victor Sherman since January 22 of 1974?

A. I refuse to testify on the grounds of the Fifth Amendment."

The questions propounded dealt solely with information relating to the whereabouts of the child and her father and the record contains no evidence from which the court could infer that answers thereto are incriminating.

Respondents Dilcher have thus failed to demonstrate any legal basis upon which they are entitled to assert the privilege against self-incrimination. In Marine Mid. Tr. Co. So. N.Y. v. Douvanis, 50 D. & C. 2d 403 (1970), Judge Wieand observed:

"The suggestion of defendant's attorney that defendant may be subjected to prosecution as a result of answers given to questions is not supported by substance. The discovery proceedings . . . are limited . . . and defendant has failed to show that his responses to questions asked would be incriminating in any way. See Kirtley v. Abrams, 184 F. Supp. 65 (D.C.E.D.N.Y.)" At 405.

It has been suggested that the Dilchers could be charged with the offense of interference with the custody of children under section 2904 of the Crimes Code of December 6, 1972, P.L. 1482, 18 C.P.S.A. §2904, but the likelihood of such a charge is far too conjectural and remote. In any event, there is no basis to conclude that by answering the

questions posed at the depositions the Dilchers will be exposed to prosecution thereunder. Furthermore, section 2904 requires the existence of a custody order as a condition precedent to liability, contains numerous defenses and has a two-year statute of limitations.[1]

We next turn to the question of the manner in which the privilege against self-incrimination was attempted to be exercised here. A perusal of the transcript reveals that it was Roth who from the very outset of the depositions advised respondents Dilcher to refuse to answer the questions asked:

"Mr. Roth: Mr. Zamborsky, I'd like to make a statement for the record. I represent Mr. William Dilcher. I represent Mrs. Yvonne Dilcher. I received a copy of the notice for the taking of the depositions today. Naturally, I've discussed this matter with my clients on several occasions between the time the notices were sent out and coming to court today. I have never asked Mr. and Mrs. Dilcher whether or not they know where Mrs. Dilcher's son is. I have not asked them anything about the Power of Attorney. I did not prepare the Power of Attorney. And I pointed out to them the implications of various aspects of this deposition, including under the Criminal Code, as example, that it is a crime to interfere with the custody of a child; and I pointed out to them that there is a Court Order awarding custody to Mrs. Sherman. It's Barbara as I recall.

Mr. Zamborsky: That's correct.

---

1. Section 108 of the Crimes Code, supra.

Mr. Roth: And so, even though I haven't asked them and I do not know about any of the aspects of what they would testify to and what they wouldn't testify to, I've advised them, because of the clear implications of possibly several criminal aspects of this, that they should take their rights under the Fifth Amendment and refuse to testify on the grounds that their testimony may tend to incriminate them. I've told them that they can go ahead and give their names and address, but that's it."

It is clear, however, that the privilege, if one exists, is a personal privilege which must be exercised by the witness and cannot be exercised by the witness' attorney: Communist Party v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed. 2d 625 (1961); Com. v. Kinnard, 230 Pa. Superior Ct. 134, 326 A. 2d 541 (1974); and Laub's Pennsylvania Trial Guide, Vol. 1, §7.107.

In his brief Zamborsky alluded to the issue of conflict of interest by Roth's multiple representation of all the respondents. According to the case papers, on January 18, 1974, Roth filed a written entry of his appearance for the respondent Sherman in the office of the prothonotary. In representing the Dilchers, he has done so without ever having filed a written praecipe of appearance on their behalf, although he signed as "attorney for defendants" in answer to a petition for a rule to show cause on November 17, 1976. His appearance on behalf of the respondent Sherman has not been withdrawn.

Compounding the rather difficult problems attendant to this proceeding, involving as it does the whereabouts and welfare of an 11-year-old child, troublesome questions arise about counsel's actions in this case, including, but not necessarily by way of limitation, those regarding his representation of all respondents and his efforts depicted in

the depositions to assert the privileges against self-incrimination and that of attorney-client,[2] which have thus far blocked and frustrated petitioner's attempts to ascertain the whereabouts of her child. While a lawyer has a duty to represent a client zealously, he is an officer of the court and must observe the standards set forth in the Code of Professional Responsibility. Canon 5 of the Code of Professional Responsibility, and more specifically Disciplinary Rule DR 5-105, deals with the exercise of independent professional judgment by an attorney and the matter of multiple clients. EC 5-16 requires full explanation "to each client [of] the implications of the common representation" and counsels that such representation should be accepted or continued "only if the clients consent" and EC 5-15 requires an attorney to "resolve all doubts against the propriety [of representing multiple clients with different interests]." It should be apparent to counsel that the present interests of the respondent Sherman, on the one hand, and those of the respondents Dilcher, on the other, may conflict, and one who undertakes representation of all of their interests without adherence to such standards treads perilous waters.

There are no proceedings of more paramount importance than those dealing with the welfare of children. As we observed in Traill v. Traill, 36 Lehigh 412 (1975): "The practice of grabbing the children and running off with them in custody cases is to be condemned. The welfare of the children is paramount to the niceties of the antagonisms of estranged [litigants]." We abhor such gamesmanship and will not sanction any process

2. We make no finding with respect to the validity of the exercise of the attorney-client privilege.

which is destructive or which otherwise works havoc or trauma in the life of innocent youth. See Com. ex rel. Spriggs v. Carson, 229 Pa. Superior Ct. 9, 323 A. 2d 273 (1974); and Ford v. Ford, 371 U.S. 187, 83 S.Ct. 273 (1962). "In child custody cases the paramount question is the welfare of the children and all other considerations, . . . even the rights of parents, are subordinate to the children's physical, intellectual, spiritual and emotional well being. . . ." Com. ex rel. Thomas v. Gillard, 203 Pa. Superior Ct. 95, 98, 198 A. 2d 377, 378 (1964). Such was our interest in January of 1974 when we first entered our order and such is our interest today.

Accordingly, we will direct respondents Dilcher to answer the questions posed at the October 26, 1976, depositions; their failure to do so may require their accountability for contempt. See In re Martorano, 464 Pa. 66, 346 A. 2d 22 (1975).

### ORDER

Now, February 14, 1977, for the reasons set forth in the foregoing opinion, it is ordered that the respondents, William Dilcher and Yvonne Dilcher, answer questions inquiring of the present whereabouts of respondent James Victor Sherman and Susan Yvonne Sherman.